IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-99

 No. 218A20

 Filed 27 August 2021

 IN THE MATTER OF: M.A.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 27

 February 2020 by Judge Shamieka L. Rhinehart in District Court, Durham County.

 This matter was calendared for argument in the Supreme Court on 21 June 2021 but

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 The Law Office of Derrick J. Hensley, PLLC, by Derrick J. Hensley, for
 petitioner-appellee Durham County Department of Social Services.

 Carrie A. Hanger for appellee Guardian ad Litem.

 Peter Wood for respondent-appellant mother.

 HUDSON, Justice.

¶1 Respondent, the mother of M.A. (Mark)1, appeals from the trial court’s order

 terminating her parental rights on the grounds of neglect and willful failure to make

 reasonable progress to correct the conditions that led to the child’s removal from the

 home. Because we hold the trial court did not err in concluding that grounds existed

 to terminate respondent’s parental rights under N.C.G.S. § 7B-1111(a)(1) based on

 1 A pseudonym is used to protect the juvenile’s identity and for ease of reading.
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 neglect, we affirm the trial court’s order.

 I. Facts and Procedural History

¶2 On 1 June 2015, the Durham County Department of Social Services (DSS)

 obtained nonsecure custody of then ten-month-old Mark and his fifteen-year-old

 brother, J.M.2, and filed a juvenile petition alleging they were neglected juveniles. In

 the petition, DSS alleged that respondent and the children were chronically homeless

 and had been staying “from place to place.” The petition further alleged that on 21

 May 2015, J.M. returned from school to the place where they had been staying and

 was unable to locate respondent. Respondent did not leave any information or

 instructions on where she could be found. After still not being able to find respondent

 that evening, J.M. went to his maternal grandmother’s senior residential complex at

 1:00 a.m. to have a place to stay. On 1 June 2015, the maternal grandmother informed

 DSS that J.M. could no longer stay with her as her residence did not allow children,

 and she was concerned about being evicted. DSS believed Mark was with respondent,

 however she had not been located at the time of filing the petition.

¶3 On 2 June 2015, respondent showed up at DSS’s office with Mark. The social

 worker addressed the allegations and petition with respondent and explained that

 DSS had obtained legal custody of her children on 1 June 2015. Respondent left Mark

 2 J.M. has reached the age of majority and is not a part of this appeal. Therefore, we

 discuss the facts primarily as they relate to Mark.
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 in the custody of DSS, and he was placed in foster care.

¶4 On 20 August 2015, the trial court entered an order adjudicating the children

 as neglected juveniles based on stipulations by the parties. In order to correct the

 conditions that led to the children’s removal, the trial court ordered respondent to

 complete a psychological evaluation with collateral contacts and objective testing, and

 follow any recommendations for mental health treatment; complete a parenting class

 and demonstrate and verbalize an understanding of the skills learned; obtain and

 maintain stable housing; obtain and maintain stable employment; demonstrate an

 ability and willingness to meet the children’s needs; refrain from substance abuse;

 maintain contact with the social worker and provide current contact information; and

 maintain visitation with the children. The trial court granted respondent two hours

 of supervised visitation every other week.

¶5 Following a review hearing held 17 November 2015, the trial court entered an

 order on 11 January 2016 continuing custody with DSS and placing Mark with his

 paternal great grandmother. The trial court found that respondent was employed and

 seeking housing, had started parenting classes, had completed a substance abuse

 assessment from which no services were recommended, and had completed a

 psychological evaluation.

¶6 In a review order entered on 7 June 2016, the trial court set the permanent

 plan for Mark as reunification with a secondary plan of guardianship. The trial court
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 found that respondent had obtained a one-bedroom home through Housing for New

 Hope. DSS had assessed the home on 31 May 2016 and found it to be appropriate for

 Mark. The trial court further found that respondent was making progress and was

 not a safety risk to Mark during visits but that she still needed to complete the

 parenting course and obtain sufficient income to meet the needs of her children. The

 trial court allowed respondent unsupervised visitation with Mark with the possibility

 of transitioning to overnight visits. In addition to respondent’s prior case plan

 requirements, the trial court ordered respondent to obtain a domestic violence

 assessment due to a history of domestic violence.

¶7 On 10 August 2016, Mark was placed in a foster home after the paternal great

 grandmother indicated she could no longer care for him due to her health. On 8

 September 2016, respondent was awarded overnight unsupervised visits on the

 condition that the father not be present.

¶8 In a 2 May 2017 permanency-planning-review order, the trial court continued

 the permanent plan of reunification but changed the secondary plan to adoption. The

 trial court found that respondent completed a domestic violence assessment in

 December 2016 which recommended mental health treatment and domestic violence

 counseling. Respondent completed a mental health assessment on 28 February 2017,

 and no treatment was recommended. However, DSS was concerned that respondent

 underreported her domestic violence history. Respondent completed an addendum to
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 the initial assessment on 15 August 2017. However, the trial court found that

 respondent “continued to minimize her domestic violence history and its impact on

 her.”

¶9 After another hearing, the trial court subsequently entered a permanency-

 planning-review order continuing the permanent plan of reunification with a

 secondary plan of adoption. The trial court found that respondent had housing and

 had been employed at the same company for the past eighteen months. However, the

 trial court found that respondent’s participation in domestic violence counseling had

 been “sporadic” and that respondent did not fully acknowledge the effects of her

 domestic violence history, nor did she fully understand the reasons the trial court was

 ordering her to engage in domestic violence counseling.

¶ 10 On 24 May 2018, DSS filed a motion to terminate respondent’s parental rights

 to Mark alleging the grounds of neglect and willfully leaving the child in foster care

 for more than twelve months without making reasonable progress to correct the

 conditions that led to his removal from the home. See N.C.G.S. § 7B-1111(a)(1)–(2)

 (2019). DSS alleged that respondent failed to demonstrate a willingness and ability

 to meet Mark’s needs due to respondent’s “delays in scheduling and attending

 assessments and treatment, her sporadic attendance at treatment, incomplete

 disclosures regarding problems and failure to utilize all visitation opportunities with

 the child.” DSS further alleged that respondent “exhibit[ed] a pattern of behavior of
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 disengagement and lack of follow through” as she had “several older children for

 whom she failed to engage in services in order to safely parent th[o]se children.”

¶ 11 Following a hearing on 20 and 23 July 2018, the trial court entered a

 permanency-planning-review order on 28 August 2018 changing the permanent plan

 to adoption with a secondary plan of guardianship. The trial court found that

 although respondent had stable housing, she had yet to complete the Parenting

 Capacity Assessment that was ordered in October 2017 which would address

 respondent’s understanding of the impact of her domestic violence and her ability to

 keep Mark and herself safe. The trial court further found that respondent missed a

 permanency planning review meeting and failed to provide an explanation, and that

 respondent was not at her home when the social worker conducted a pop-in visit

 during Mark’s unsupervised visitation. The trial court found that it is not possible for

 Mark to return to respondent’s care within the next six months because she “has not

 completed her court ordered services, especially the Parenting Capacity Assessment,

 . . . and her sporadic attendance of domestic violence counseling.”

¶ 12 The trial court conducted a termination-of-parental-rights hearing on 15

 August, 9 and 15 October, 14 November, and 6 and 11 December 2019. On 27

 February 2020, the trial court entered an order concluding that respondent’s parental

 rights were subject to termination on the grounds of neglect and willful failure to

 make reasonable progress to correct the conditions that led to Mark’s removal from
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 the home. The trial court further concluded that termination of respondent’s parental

 rights was in Mark’s best interests. Accordingly, the trial court terminated

 respondent’s parental rights. Respondent appealed.

 II. Analysis

¶ 13 On appeal, respondent contends the trial court erred by adjudicating grounds

 for termination of her parental rights under N.C.G.S. § 7B-1111(a)(1) and (2).

 Because only one ground is necessary to terminate parental rights, we only address

 respondent’s arguments regarding the ground of neglect. See In re A.R.A., 373 N.C.

 190, 194 (2019).

¶ 14 We review a trial court’s adjudication “to determine whether the findings are

 supported by clear, cogent and convincing evidence and the findings support the

 conclusions of law.” In re Montgomery, 311 N.C. 101, 111 (1984). Unchallenged

 findings of fact “are deemed supported by competent evidence and are binding on

 appeal.” In re T.N.H., 372 N.C. 403, 407 (2019). “Moreover, we review only those

 findings necessary to support the trial court’s determination that grounds existed to

 terminate respondent’s parental rights.” Id. “The trial court’s conclusions of law are

 reviewable de novo on appeal.” In re J.O.D., 374 N.C. 797, 801 (2020).

¶ 15 A trial court may terminate parental rights when it concludes the parent has

 neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-

 1111(a)(1). A neglected juvenile is one “whose parent, guardian, custodian, or
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

caretaker does not provide proper care, supervision, or discipline; . . . or who lives in

an environment injurious to the juvenile’s welfare.” N.C.G.S. § 7B-101(15) (2019). In

some circumstances, a trial court may terminate a parent’s rights based on neglect

that is currently occurring at the time of the termination hearing. See, e.g., In re

K.C.T., 375 N.C. 592, 599–600 (2020) (“[T]his Court has recognized that the neglect

ground can support termination . . . if a parent is presently neglecting their child by

abandonment.”). However, for other forms of neglect, the fact that “a child has not

been in the custody of the parent for a significant period of time prior to the

termination hearing” would make “requiring the petitioner in such circumstances to

show that the child is currently neglected by the parent . . . impossible.” In re N.D.A.,

373 N.C. 71, 80 (2019) (quoting In re L.O.K., 174 N.C. App. 426, 435 (2005)). In this

situation, “evidence of neglect by a parent prior to losing custody of a child—including

an adjudication of such neglect—is admissible in subsequent proceedings to

terminate parental rights[,]” but “[t]he trial court must also consider any evidence of

changed conditions in light of the evidence of prior neglect and the probability of a

repetition of neglect.” In re Ballard, 311 N.C. 708, 715 (1984). After weighing this

evidence, the trial court may find the neglect ground if it concludes the evidence

demonstrates “a likelihood of future neglect by the parent.” In re R.L.D., 375 N.C.

838, 841 (2020) (quoting In re D.L.W., 368 N.C. 835, 843 (2016)). Thus, even in the

absence of current neglect, the trial court may adjudicate neglect as a ground for
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 termination based upon its consideration of any evidence of past neglect and its

 determination that there is a likelihood of future neglect if the child is returned to

 the parent. In re R.L.D., 375 N.C. at 841 n.3.

¶ 16 Respondent acknowledges that Mark was previously adjudicated to be a

 neglected juvenile but challenges the trial court’s finding as to the likelihood of a

 repetition of neglect.

 A. Challenged Findings of Fact

¶ 17 Respondent first challenges the following findings of fact:

 11. That at the time of this termination hearing, the
 Petitioner demonstrated by and through the evidence
 presented that conditions rising to the level of neglect
 existed during the pendency of the termination action in
 that the child lived in an environment injurious and that
 the parents did not provide proper care or supervision in
 that there continued to be unstable housing, unresolved
 issues of domestic violence, the father’s abandonment and
 issues surrounding the parent’s willingness and ability to
 provide proper supervision and care in the home.

 ....

 64. The [c]ourt is aware that there has not been any
 reporting of any incidents of domestic violence since
 adjudication, but the [c]ourt is concerned that the mother
 has continued to underreport her history of domestic
 violence. Dr. Harris-Britt did state that the mother did not
 demonstrate an understanding of the skills she may have
 learned in her domestic violence counseling. The [c]ourt
 finds that the mother was unable to articulate the skills
 she learned in her domestic violence counseling with KKJ
 Services as testified to in this hearing.

 65. The [c]ourt acknowledges the reasons [Mark] was
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

neglected in the underlying adjudication and disposition;
however, the [c]ourt must assess risk and harm. This
[c]ourt does not believe that the mother could protect
herself or [Mark] from being in a situation of domestic
violence or being able to protect [Mark] if she found herself
in that situation. The [c]ourt finds that the mother has yet
to progress with her understanding of domestic violence
and how it could impact her and what she would need to do
to protect herself and [Mark].

66. The [c]ourt also finds that the reason that [Mark] was
removed was because of instability of housing. The [c]ourt
looks at how differently the mother’s housing status has
changed from when [Mark] entered in the custody of DSS.
At the time this case was adjudicated, the mother resided
at Urban Ministries. The mother was able to locate a one-
bedroom apartment and resided there for about three
years. However, the mother moved in April of 2019 after
having stable housing for a good period to move to a studio
apartment with a co-worker where she is not on the lease.
The mother reports that she moved to be closer to a better
school; however, her housing situation remains unstable.
The mother did not communicate to DSS that she had
moved until September of 2019 when she requested that
DSS look at her home so she could have overnight
supervised visits. When [DSS] inquired as to who stayed
with the mother, she did not provide a name of who stayed
with her. It was not only until the hearing, that the mother
revealed that she was staying with a roommate and the
name of the roommate was given. Apparently, the mother’s
roommate is a male co-worker.

....

68. The [c]ourt wonders where the visits were occurring
during the time period where the mother was staying at
her new residence that had not been approved for
overnight weekend visits. The mother would have known
that it was important to have been in place at the
apartment that was approved for her visits so that the
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

social worker could bring back to the [c]ourt information
about how the visits were going. During this same
timeframe, the mother was requesting drop off and pick up
of [Mark] at various public places but not the residence
that was approved for her visits.

....

70. The [c]ourt finds that the fact that the mother was
having unsupervised overnight weekend visits made her
unmotivated in addressing the concerns of the court. The
mother was ordered to complete the PCA in November of
2017 and it was not completed until November of 2018. The
mother did not tell social worker Dearing that she had
moved in April of 2019; the mother requested an
assessment of her “new” home, approximately five months
after she moved. The [c]ourt is baffled as to why the mother
would not tell the social worker she had moved.

71. The [c]ourt finds that the mother has been working, but
the [c]ourt still has concerns as to whether she can
maintain her own household with her own efforts. The
[c]ourt also finds that the mother has had the type of
visitation she has had for a good period, but the court still
finds that: 1) she still does not have stable housing and that
she continues to struggle in maintaining a safe and
functioning home for [Mark]; 2) the [c]ourt also is
concerned because Dr. April Harris-Britt has made
recommendations for an ACTT team and intensive mental
health services along with her having domestic violence
counseling and the mother still has yet focused and
address[ed] the core issues of domestic violence about
which the [c]ourt remains concerned. The [c]ourt is dubious
of the mother’s participation for services with KKJ Services
and whether the mother’s participation with this program
will decrease the likelihood that [Mark] is returned to
conditions resulting in his neglect given her lack of insight
and her high level of distrust.

72. The [c]ourt also gives great weight to how long [Mark]
has been in the care of DSS since 2015. He has been in the
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 care of DSS for most of his life. The mother has had ample
 times to address these issues that continue to pose a risk if
 [Mark] were returned to her care. The mother lives in a
 small apartment with a man and pays half the rent and not
 paying the utilities. The [c]ourt does not know whether
 [Mark] was kept safe or properly supervised and cared for
 during these overnight visits. When the social worker
 would go to the residence that was approved for her visits
 for unannounced pop-in visits, the mother and [Mark] were
 not there. The [c]ourt does not know what, if anything,
 [Mark] was exposed to and the mother knew that pop-in
 visits were required by . . . DSS.

 ....

 74. The [c]ourt finds that there is a likelihood of repetition
 of neglect if the juvenile was returned to the home of the
 Respondents[3] based upon the findings of fact herein and
 the underlying permanency planning orders relied upon
 and incorporated herein.

 75. Respondents’ failure to adequately and timely address
 the issues that led to the removal of the juvenile from the
 home constitutes neglect. That failure to adequately and
 timely address the neglectful behaviors, renders the
 Respondents incapable of providing adequate care and
 supervision of the juvenile. The probability that the neglect
 will be repeated and said incapability will continue in the
 future is high given the failure of the Respondents to
 address and alleviate the issues.

 76. The Respondent Mother has demonstrated a settled
 pattern of neglect of the juvenile, and this pattern is likely
 to continue into the foreseeable future. The [c]ourt finds
 there is a reasonable probability that such neglect would
 be continued and repeated if the juvenile was to be
 returned to the care, custody, or control of the
 Respondents.

3 Although M.A.’s father was a respondent in this case, he is not party to this appeal.
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 ....

 81. The [c]ourt finds that, as of the time of the termination
 hearing, the Respondent Mother has not made reasonable
 progress under the circumstances to correct the conditions
 that led to the juvenile’s removal in that while she did
 maintain housing for a period of time, she moved without
 notifying the social worker during a time when she was
 being allowed unsupervised overnight visitations. There
 were periods of time when the social worker could not
 complete any pop-in visits to observe and monitor these
 visits. The mother stopped having drop-offs and pickups at
 her known residence. She then relocated to an apartment
 residence with an undisclosed male roommate and no
 lease. She failed to cooperate with the mental health
 recommendations. She did not participate in domestic
 violence treatment to the satisfaction of this [c]ourt. She
 failed to comp[l]ete the Parenting Capacity Assessment
 until a year after it was ordered and then failed to
 demonstrate the willingness and ability to comply with the
 recommendations from that assessment. These last two
 services were ordered by this [c]ourt in order to remedy the
 conditions which led to the juvenile’s adjudication, namely
 [the] mother’s homelessness and housing instability and
 the contributions [of] her history of Domestic Violence
 which the [c]ourt found was critical in the neglect of this
 juvenile. The Respondent Mother willfully failed and
 refused to substantially complete the services as ordered
 by the [c]ourt in a reasonable manner and timeframe.[4]

¶ 18 Respondent raises no specific evidentiary challenges to these findings but

 “disputes” them generally. After reviewing the record, including the testimony from

 the termination hearing and the unchallenged findings of fact, we hold the challenged

 4 Although respondent challenges finding of fact 81 in her argument regarding
 grounds for termination under N.C.G.S. § 7B-1111(a)(2), the finding is also relevant to
 support the ground of neglect, so we address it here.
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 findings are supported by competent evidence in the record. First, the social worker

 testified at the termination hearing regarding respondent’s progress on her case plan

 over the four years that Mark had been in DSS custody, including testimony

 regarding respondent’s housing situation, her participation in domestic violence

 treatment, and her visitations with Mark. The social worker testified that respondent

 no longer had stable housing and did not inform DSS that she had relocated until five

 months after she had moved, had not completed domestic violence treatment as

 recommended by her case plan, and was not always present at her home when the

 social worker attempted random pop-in visits during several of respondent’s

 unsupervised visitation periods. The social worker also testified that respondent

 delayed in completing some services, including taking one year to complete the

 Parenting Capacity Assessment, which respondent was ordered to complete to

 address respondent’s domestic violence issues.

¶ 19 Furthermore, the psychologist who conducted the Parenting Capacity

 Assessment testified at the termination hearing that respondent had “extremely

 limited insight into how her own behaviors had impacted her children, why they were

 in care[,]” and that respondent’s “inability to recognize or acknowledge the really

 important events that have happened for her as well as for her children will impact

 her ability to . . . benefit from services” and “ultimately will impact her ability to

 provide a safe and nurturing appropriate home for [Mark].” The Parenting Capacity
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 Assessment, which was admitted into evidence at the termination hearing, stated

 that respondent “continues to display an unwillingness to accept accountability and

 a continuous lack of consistency in completing the actions necessary to meet the

 requirements of the court for reunification.” The assessment also stated that,

 although respondent participated in domestic violence classes, “she did not

 demonstrate or verbalize understanding of the skills she may have received in [those]

 classes.”

¶ 20 Finally, the trial court found in other unchallenged findings that respondent

 moved to a studio apartment without informing DSS and was unable to provide a

 lease to the apartment nor the name of the roommate that lived with her. As a result,

 DSS was not able to approve respondent’s residence for overnight visitations. The

 trial court also found that respondent had not provided any documentation to DSS

 showing that she was participating in mental health counseling, as recommended by

 her domestic violence assessment, and that respondent informed the social worker

 that she was receiving domestic violence counseling at KKJ, where she “participates

 in support group sessions where the participants discuss outcomes for domestic

 violence.” The trial court further found that although respondent was present at her

 home during some of DSS’s pop-in visits during her visitations with Mark, there were

 at least ten times where respondent was not at her home with Mark. Because there

 is substantial evidence in the record to support the challenged findings, including
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 testimony from the termination hearing and other unchallenged findings, we reject

 respondent’s general challenge to the trial court’s findings of fact.

¶ 21 Respondent also argues that findings of fact 64 and 65, which relate to

 respondent’s domestic violence issues, are mere speculation by the trial court and

 based on “pure conjecture.”5 “The [trial] court has the responsibility of making all

 reasonable inferences from the evidence presented.” In re N.P., 374 N.C. 61, 65 (2020).

 “Such inferences, however, cannot rest on conjecture or surmise. This is necessarily

 so because an inference is a permissible conclusion drawn by reason from a premise

 established by proof.” In re K.L.T., 374 N.C. 826, 843 (2020) (cleaned up) (quoting

 Sowers v. Marley, 235 N.C. 607, 609 (1952)).

¶ 22 We conclude the trial court’s inferences in findings of fact 64 and 65 are not

 based merely on conjecture. The trial court could reasonably infer from the evidence

 presented that respondent would not be able to protect herself or Mark from being in

 a domestic violence situation or to protect Mark if she found herself in that situation.

 In the termination order, the trial court acknowledged that there had not been any

 reports of incidents of domestic violence since the adjudication in 2015. However, the

 trial court expressed concern that respondent was underreporting her domestic

 violence history. The trial court also found that respondent was unable to articulate

 5 Respondent also challenges finding of fact 68 for the same reasons, however, that

 finding is not necessary to support the ground of neglect.
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 the skills she learned in her domestic violence counseling and that she had not

 progressed with her understanding of domestic violence, how it could impact both her

 and Mark, and what she would need to do to protect herself and Mark. At the

 termination hearing, the psychologist that conducted respondent’s Parenting

 Capacity Assessment testified that respondent was “extremely limited in her ability

 and willingness to share information about her domestic violence history” and

 “oftentimes” would underreport that information. The psychologist also testified that

 respondent’s “inability to recognize or acknowledge” her history would impact her

 ability to benefit from services and ultimately impact her ability to provide a safe and

 nurturing home for Mark. The trial court could reasonably infer from this evidence

 that respondent would not be able to utilize the learned skills in order to protect

 herself and Mark from a domestic violence situation.

¶ 23 Respondent also “disputes the findings that she had failed to obtain stable

 housing.” She contends that one move in over three years “is hardly unstable” and

 that the only issue with her housing “seemed to be that DSS had not had time to

 investigate her new residence or her new roommate.” We disagree.

¶ 24 The evidence and findings support the trial court’s conclusion that at the time

 of the termination hearing, respondent did not have stable housing. The trial court

 found that respondent had obtained stable housing for three years while she was

 residing in the one-bedroom home she had been renting that DSS found to be
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 appropriate for Mark. However, around April of 2019, respondent moved to a studio

 apartment that she shared with a male coworker where she was not named on the

 lease. The trial court found that respondent did not inform DSS of the move until five

 months later when she requested a home assessment for overnight visits, that

 respondent was not forthcoming about the move when questioned by the social

 worker, and that respondent failed to provide a name for her roommate until the

 termination hearing. Based on these findings, the trial court found that although

 respondent had obtained stable housing “for a good period[,]” at the time of the

 termination hearing “her housing situation remain[ed] unstable.”

¶ 25 Although one relocation in a period of three years does not necessarily indicate

 instability, respondent moved from an approved one-bedroom home where she was

 the only tenant named on the lease to a shared studio apartment where she was not

 named as a tenant on the lease, and thus she has no legal right to remain in the home.

 Respondent testified at the termination hearing that she split the rent with her

 roommate but that the roommate paid for the utilities. Respondent also testified that

 she had moved to the apartment “several months ago” but she did not know the exact

 date and that she was “planning on finding a two-bedroom apartment or a house.”

 Therefore, we conclude the trial court’s findings that respondent did not have stable

 housing at the time of the termination hearing are sufficiently supported.

 B. Repetition of Neglect
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

¶ 26 Respondent next argues the trial court erred in determining there was a

 likelihood of future neglect. Citing N.C.G.S. § 7B-903.1(c), respondent contends that

 the trial court’s finding of a probability of future neglect is inconsistent with its

 determination that she continued to have unsupervised visits for the three years

 leading up to the termination hearing.

¶ 27 Subsection 7B-901.3(c) provides that

 [i]f a juvenile is removed from the home and placed in the
 custody or placement responsibility of a county department
 of social services, the director shall not allow unsupervised
 visitation with or return physical custody of the juvenile to
 the parent, guardian, custodian, or caretaker without a
 hearing at which the court finds that the juvenile will
 receive proper care and supervision in a safe home.

 N.C.G.S. § 7B-903.1(c) (2019). The Juvenile Code defines a “[s]afe home” as “[a] home

 in which the juvenile is not at substantial risk of physical or emotional abuse or

 neglect.” N.C.G.S. § 7B-101(19).

¶ 28 Respondent argues that because the trial court did not change her

 unsupervised visitation during the four-month period in which the termination

 hearing was held, “the court must have determined that [respondent] had continued

 to provide a safe home free of neglect.” She contends that although the trial court did

 not specifically find in the termination order that respondent had provided a safe

 home free of neglect for Mark, it “implicitly reached those conclusions when it

 continued to allow unsupervised visits.” Therefore, respondent contends that the trial
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 court’s finding of a probability of neglect was “irreconcilably inconsistent” with

 allowing continued unsupervised visits. She further argues that even if the evidence

 could support neglect, allowing respondent to continue to exercise unsupervised

 visitation was “internally inconsistent” with a finding of a probability of future

 neglect. Respondent’s arguments are misplaced.

¶ 29 Pursuant to Rule 58 of the North Carolina Rules of Civil Procedure, “a

 judgment is entered when it is reduced to writing, signed by the judge, and filed with

 the clerk of court.” N.C.G.S. § 1A-1, Rule 58 (2019). Additionally, “a trial court’s oral

 findings are subject to change before the final written order is entered.” In re A.U.D.,

 373 N.C. 3, 9–10 (2019). Thus, even assuming the trial court had determined that

 respondent provided a safe home during the termination hearing, the trial court’s

 finding was subject to change until the final order was entered. Because the

 termination order does not continue respondent’s unsupervised visitation, and in fact

 restricts respondent to supervised visitation, the trial court did not simultaneously

 find that respondent could provide a safe home for Mark and that there was a

 likelihood of repetition of neglect. Similarly, respondent’s assertion that the trial

 court’s findings are “internally inconsistent” is without merit. The trial court did not

 allow respondent to continue to exercise unsupervised visitation in the termination

 order in which it found a probability of future neglect.

¶ 30 Moreover, the fact that respondent was previously approved for unsupervised
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 overnight visitation at a prior address did not preclude the trial court from later

 finding a likelihood of repetition of neglect when respondent’s circumstances changed.

 At the time of the termination hearing, respondent was no longer residing at her

 approved one-bedroom home but was sharing a studio apartment with an unknown

 roommate, was not listed on the lease as a tenant, and was not paying utilities for

 the apartment. Respondent failed to inform DSS of the move for five months despite

 continuing to exercise her unsupervised overnight visitation. Therefore, we reject

 respondent’s arguments.

¶ 31 Finally, respondent argues the evidence presented at the termination hearing

 did not support the trial court’s finding of a probability of future neglect. We disagree.

¶ 32 “A parent’s failure to make progress in completing a case plan is indicative of

 a likelihood of future neglect.” In re M.A., 374 N.C. 865, 870 (2020) (quoting In re

 M.J.S.M., 257 N.C. App. 633, 637 (2018)). However, “[a]s this Court has previously

 noted, a parent’s compliance with his or her case plan does not preclude a finding of

 neglect.” In re J.J.H., 376 N.C. 161, 185 (2020) (citing In re D.W.P., 373 N.C. 327,

 339–40 (2020) (noting the respondent’s progress in satisfying the requirements of her

 case plan while upholding the trial court’s determination that there was a likelihood

 that the neglect would be repeated in the future because the respondent had failed

 “to recognize and break patterns of abuse that put her children at risk”)); see also In

 re Y.Y.E.T., 205 N.C. App. 120, 131 (explaining that a “case plan is not just a check
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 list” and that “parents must demonstrate acknowledgement and understanding of

 why the juvenile entered DSS custody as well as changed behaviors”), disc. review

 denied, 364 N.C. 434 (2010). Although respondent had made some progress on the

 requirements of her case plan, she had not addressed the conditions that resulted in

 Mark’s placement in DSS custody.

¶ 33 The trial court found that Mark was removed from respondent’s care and

 adjudicated to be a neglected juvenile primarily due to respondent’s unstable housing

 and history of domestic violence. The trial court also found that conditions rising to

 the level of neglect existed during the pendency of the termination action due to

 respondent’s continued unstable housing and unresolved issues of domestic violence.

 Respondent had over four years to address the conditions that led to Mark’s removal

 but failed to do so. Although respondent attended some domestic violence counseling,

 the trial court found that she “did not participate in domestic violence treatment to

 [its] satisfaction” and that she did not demonstrate an understanding of her domestic

 violence issues, how they impacted her and Mark, and how to protect herself and

 Mark in a domestic violence situation. The findings also show that although

 respondent had obtained stable housing for a period of three years, at the time of the

 termination hearing respondent was sharing a studio apartment with a male

 coworker and was not on the apartment lease as a tenant. Respondent was not

 forthcoming about her move and did not inform DSS of the move or request an
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

 assessment of her new home until five months after she moved despite continuing to

 exercise her unsupervised visitation. The trial court also found that respondent

 “failed to comp[l]ete the Parenting Capacity Assessment until a year after it was

 ordered and then failed to demonstrate the willingness and ability to comply with the

 recommendations from that assessment.” Finally, the trial court found that

 respondent’s failure to adequately and timely address the issues that led to Mark’s

 removal from her care constitutes neglect.

¶ 34 We hold the evidence and findings demonstrate that Mark is likely to be

 neglected again if returned to respondent’s care due to her lack of stable housing and

 unresolved domestic violence issues and that they support the trial court’s ultimate

 finding that there is a likelihood of repetition of neglect. See In re M.A., 374 N.C. at

 870 (holding that, although the respondent claimed to have made reasonable progress

 in addressing elements of his case plan, the trial court’s findings regarding the

 respondent’s failure to adequately address the issue of domestic violence, which was

 the primary reason that the children had been removed from the home, were,

 “standing alone, sufficient to support a determination that there was a likelihood of

 future neglect”). As a result, the trial court did not err by determining that grounds

 existed under N.C.G.S. § 7B-1111(a)(1) to terminate respondent’s parental rights.

 Respondent does not challenge the trial court’s dispositional determination that

 termination of her parental rights was in Mark’s best interests. See N.C.G.S. § 7B-
 IN RE M.A.

 2021-NCSC-99

 Opinion of the Court

1110(a) (2019). Accordingly, we affirm the trial court’s order terminating respondent’s

parental rights.

 AFFIRMED.